# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

CAROLYN DUNN LUKSZA & PATRICIA FOSER, individually and on behalf of others similarly situated,

        Plaintiffs,

vs.

TJX COMPANIES, INC., d/b/a TJ MAXX,

        Defendant.

Case No.: 2:11-cv-01359-JCM-GWF

**ORDER**

Motion to Conditionally Certify Class (#8)

     This matter comes before the Court on Plaintiffs' Motion for Conditional Certification (#8), filed on September 27, 2011; Response to Plaintiffs' Motion (#50), filed on March 29, 2012; and Plaintiffs' Reply (#58), filed on April 27, 2012. The Court conducted a hearing on this matter on June 7, 2012. This written order follows.

## **PROCEDURAL HISTORY AND BACKGROUND**

     On August 22, 2012, Plaintiffs filed a Complaint alleging violation of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA") based on Defendant's failure to pay lawful wages to Plaintiffs, individually and to those similarly situated. *See* Complaint (#1), ¶ 1. On September 27, 2011, Plaintiffs filed this Motion to Conditionally Certify (#8) pursuant to 29 U.S.C §216(b), requesting the Court order (1) that other persons similarly situated to Plaintiffs be given notice of the pendency of this action and an opportunity to file written consents with this Court to join this action and (2) that the status of limitations be tolled for the period of time this motion is pending before the Court. At the time of the filing of the motion, three individuals had consented to join the suit: named Plaintiffs Carolyn Dunn Luksza and Patricia Foser and opt-in Plaintiff William Beauford.

On November 7, 2011, Plaintiffs filed a Supplement (#30), informing the Court that four additional individuals had consented to join the litigation: Helen Alderman, Cheryl Bieber, Calvet Howell and Patrice Wielandt. On November 18, 2011, parties stipulated to conduct phased discovery. *See* Order #31. The Court approved the parties' phased discovery plan and ordered a six month discovery period. *See* Order (#32).

On January 20, 2012, Defendant filed a Motion for Protective Order (#35), requesting the Court limit the scope of the deposition testimony to the Las Vegas distribution center. On January 30, 2012, the Court granted in part Defendant's request and ordered that the 30(b)(6) deposition testimony be limited to the Las Vegas distribution center, but further ordered that Plaintiffs are not precluded from inquiring whether certain matters are established or governed by a nationwide policy, procedure or practice. *See* Minute of Proceedings (#44).

Between the filing of the initial motion and Defendant's Response, the parties conducted a significant amount of discovery over a period of four months. Defendant deposed all seven named and opt-in Plaintiffs; Plaintiffs conducted four Rule 30(b)(6) depositions of Defendant's corporate representatives; both parties have served and responded to several written discovery requests; nearly 5,000 pages of documents have been produced; and Defendant has collected sworn declarations from 20 Shift Supervisors at the Las Vegas distribution centers. On March 29, 2012, Defendants filed their Response (#50). Upon the parties' request, the Court stayed all discovery in this matter pending decision on this motion. *See* Order (#55). Plaintiff's Reply (#58) was filed on April 27, 2012.

**I.    TJX's Structure**

Defendant TJX is a discount retailer of apparel and home fashion that operates T.J. Maxx and Marshalls stores across the United States. TJX operates nine distribution centers across the country that support the delivery of goods to the retail stores. The Las Vegas distribution center is the only center that serves both TJ Maxx and Marshalls stores ("MarMaxx"). The organization of the distribution centers, from the top down, includes general manager ("GM"), assistant general managers ("AGMs"), Area Operations Managers ("AOMs"), Shift Supervisors, and associates. Associates are employees who are assigned to a particular time-based shift within a specific

1  department. The associates are supervised by Shift Supervisors, who manage a particular
2  department for a particular shift. The AOMs oversee several different departments within one
3  distribution center and supervise the work of the Shift Supervisors. AOMs report to one of several
4  AGMs, who in turn report to the distribution center's GM.

## II.    Shift Supervisors

TJX employs approximately 70 Shift Supervisors in the Las Vegas distribution center. *See* MacDonald Depo. 12:23-24. The Shift Supervisor's job summary contained in the D/C Supervisor Exempt Job Description states

> Total responsibility for operating an efficient, productive and safe department, while meeting or exceeding daily production requirements within the Distribution Center. Ensures that quality and services are at a high level. Maintains a productive, positive, and motivated work force by spending a minimum of 90% of the total shift "on the floor" reviewing orders and directing associates.

*See* Plaintiff's Reply (#58, 59), Master Exhibit 8.

The job summary is further explained by a list of duties and responsibilities that each Shift Supervisor should perform. These duties and responsibilities include managing the day-to-day activity within the department, including planning, flow, and resource allocation by ensuring appropriate staffing levels, monitoring each associate's progress, work methods, behavior and pace and providing feedback. *Id.* Further, Shift Supervisors are responsible for developing and motivating associates, building effective relationships with business partners, effectively communicating with associates and management and ensuring constant improvement by reviewing practices, methods and processes among others. *Id.* Defendant's Vice President and General Counsel Jennifer Brady indicated this job description is used at all TJX distribution centers and has not changed since at least October 31, 2006. *See* Plaintiff's Reply (#59), Exhibit 2, Brady Depo. 35: 2-18.

The named and opt-in Plaintiffs' deposition testimony further support that the D/C Supervisor Exempt Job Description accurately describes the duties and responsibilities of a Shift Supervisor. During their deposition, named-Plaintiffs Luksza and Foser and opt-in Plaintiffs Bieber, Weilandt, Alderman and Howell stated that the duties and responsibilities contained in the

Defendant's job description accurately describe the duties they preform as Shift Supervisors. *See* Luksza Depo. at 122:13-16; Foser Depo. at 218:6-219:3; Bieber Depo. 91:16 - 92:20; Weilandt Depo. at 178:23-179:1; Alderman Depo. at 79:11-80:4; and. Howell Depo. at 125:23-126:7.[1] Further, opt-in Plaintiff Beauford agreed that, in his capacity as a Shift Supervisor, he spends the majority of his time every day "directing the work of associates, providing coaching and counseling to the extent they require it, and generally directing the flow of work through your department." Beauford Depo. at 116:9-16. Plaintiffs understanding of the job description appears consistent with the duties and responsibilities contained in the D/C Supervisor Job Description in Master Exhibit 8.

### III.     Plaintiffs' Allegations

Plaintiffs allege that Defendant mis-classified them, and potentially hundreds of other Shift Supervisors employed at nine different TJX and MarMaxx distribution centers across the country, as exempt from the overtime requirement of the FLSA. Plaintiffs allege that Shift Supervisors are classified as exempt even though they do not perform the type of work that warrants an exempt classification. Plaintiffs further allege that the Engineered Standards are a company-wide "common policy" that binds the class of Plaintiffs together and requires Shift Supervisors to conform to more oversight and regulation from immediate supervisors than in the past and to work additional uncompensated hours.

The named and opt-in Plaintiffs submitted declarations alleging that they were classified as exempt employees and worked in excess of 40 hours per week without compensation. *See generally* Plaintiffs' Motion (#8), Exhibits 1-3 and Supplement (#30), Exhibits 11-13.[2] Plaintiffs allege that the Engineered Standards require all Shift Supervisors to follow a strict regimen, which removes any independent decision making or personal judgment. *Id.* Plaintiffs also allege that after implementation of the Engineered Standards, Shift Supervisors lack any real authority to discipline associates. *Id.* The declarations also state that the Engineered Standards are common to

---

[1] The Court further notes that Master Exhibit 8 provides a percentage of time that the job requires for each duty and responsibility identified. The named and opt-in Plaintiffs did not agree or were not asked if the percentages identified on Master Exhibit 8 were accurate. *See* Reply (#58, 59), Master Exhibit 8.

[2] It does not appear that opt-in Plaintiff Calvet Howell submitted a declaration.

all Shift Supervisors across the country, and therefore there are other similarly situated, current and former Shift Supervisors at the nine distribution centers. *Id.* Plaintiffs therefore argue that the Engineered Standards do not permit Shift Supervisors to act in any manner that would justify a classification of exempt from overtime under the FLSA.

Plaintiffs deposed four different corporate representatives, Jennifer Brady, Barry Honeycutt, Avery McDonald and Christopher Walker, on nine different topic areas. Plaintiffs point to Jennifer Brady's deposition testimony to support their assertion that all Shift Supervisors are similarly situated. Brady stated "supervisors responsibilities are the same at MarMaxx facilities as compared to other TJX facilities," and "employment positions are Las Vegas-based facility" are "typically" the "same." Brady Depo. at 35:1-20 and 15:1-4. Plaintiffs further sought testimony and information on the Engineered Standards and how they apply to various employees. Plaintiffs submitted TJX documents that indicate that the Engineered Standards have been implemented in some form at every TJX distribution center. *See* Master Exhibit 135. Mr. Honeycutt was designated as the corporate representative to discuss the Engineered Standards. Mr. Honeycutt testified that Engineered Standards "provides [a] non-biased means of evaluat[ing] [an] associate, department, shift and building, etc." Honeycutt Depo., at 78:9-79:7. Plaintiffs further point to TJX documents that indicate that the Engineered Standards have increased supervisor's hours and added several additional layers to the decision-making process. *See* Master Ex. 123.

Plaintiffs argue that the deposition testimony of TJX's corporate representatives and the documents obtained through discovery supports the allegations Plaintiffs made in their declarations. Plaintiffs conclude that certification under the lenient first phase standard "is inevitable based on the facts before this Court" because Plaintiffs have made the required modest factual showing that Plaintiffs were victims of a common policy or plan that violated the law. *See* Plaintiffs' Reply (#58) at 23.

**IV.  Defendant's Allegations**

Defendant argues that certification is improper. Initially, Defendant argues that because extensive discovery has taken place, the Court should proceed to the second step analysis described hereafter, and apply a heightened standard for determining whether certification of the class is

1  proper.  Defendant maintains, however, that under either standard, certification should be denied.

2          Defendant argues that Plaintiffs have failed to show that they are similarly situated.
3  Defendant claims that the Engineered Standards are not a common policy that bind the class
4  members together, but rather the Engineered Standards are uniquely applied to each department at
5  the distribution centers and are therefore not "common" to any of the Plaintiffs.  Defendant
6  maintains that Plaintiffs have not met their burden because the only reliable evidence before the
7  Court demonstrates that the Engineered Standards are tailored to each department based on various
8  discrete characteristics.  Defendant claims that the unique application of the Engineered Standards
9  would require the Court to make highly individualized inquiries into the duties that were actually
10  performed by each of the Plaintiffs.

11          Even assuming the Court finds that the Engineered Standards apply uniformly to all
12  Plaintiffs, Defendant argues that the evidence before the Court does not support that the application
13  of the Engineered Standards are either per se unlawful or unlawful as applied.  Defendant contends
14  that the declarations submitted by Plaintiffs are not based on personal knowledge and are
15  contradicted by their deposition testimony.  Plaintiffs' declarations generally allege that Plaintiffs
16  were told exactly what to do by the AOMs, lacked decision-making power, lacked authority to
17  discipline associates and lacked discretion to deviate from the tasks assigned to them.  *See*
18  *generally* Plaintiff's Declarations at Plaintiffs' Motion (#8), Exhibits 1-3 and Supplement (#30),
19  Exhibits 11-13.  Defendant points out that Plaintiffs each agreed at their depositions that the D/C
20  Supervisor Job Description accurately reflects their duties and responsibilities as Shift Supervisors.
21  *See* Defendant's Opposition (#51), Plaintiffs' Depo. at Exhibits 7-13.  Defendants further claim that
22  Plaintiffs testified that they perform a wide range of exempt/managerial duties including planning,
23  assigning and directing associates, making decisions on staffing levels within their departments,
24  training, coaching and evaluating associates, exercising discretion to assign "coach trainers" to
25  associates, initiating and escalating disciplinary action against associates and making
26  recommendations for discipline or termination among other tasks.  *Id.*

27          Named-Plaintiff Luksza admitted during her deposition that she does not perform the same
28  tasks as associates, that she is responsible for coordinating associate assignments in work areas,

checking the work of associates in her areas, monitoring associate progress, providing feedback to associates, developing associates, nominating associates for associate of the month and disciplining associates. Luksza Depo. 118 and 151-152. She further stated that she exercised her discretion to assign a coach trainer to certain associates. *Id.* at 102. Defendant argues these statements are in direct contradiction to her declaration stating that "all front Line Shift Supervisors [are] told exactly what tasks to do, when to do those tasks, and how to perform these tasks." Lukzsa Decl. ¶ 9.

Further opt-in Plaintiff Beauford indicated in his declaration that he "never had any disciplinary authority." Beauford Decl. ¶ 8. Defendants argue that Mr. Beauford's deposition testimony is in direct contradiction to that statement. Mr. Beauford indicated in his deposition that he does take disciplinary action against associates including issuing verbal and written warnings and deciding whether to further escalate disciplinary action when prior disciplinary actions are unsuccessful. Beauford Depo. 129-130.

Defendant points to opt-in Plaintiffs Bieber and Alderman's deposition testimony to further illustrate that Plaintiffs' declarations contain false statements. Plaintiff Bieber admitted at her deposition that the following statements in her declaration were false: that she and other Shift Supervisors lacked any decision-making power and that "all Shift Supervisors were told exactly what tasks to do, when to do those tasks, and how to perform those tasks." Bieber Depo. 218:5-8 and 219:2-14. Contrary to her declaration, Ms. Bieber further indicated that she had no personal knowledge of the impact of the Engineered Standards on other Shift Supervisors in Las Vegas or around the country. Bieber Depo. 222.

Defendant further highlights Plaintiff Alderman's deposition testimony where she stated that she had authority to discipline associates, which is contrary to her declaration statement indicating that "I never had any disciplinary authority." Alderman Depo. 206:2-5. Plaintiff Alderman additionally stated that her declaration statement indicating that she never had any ability to deviate from the tasks assigned by the AOMs was incorrect and that, in fact, she had flexibility to perform her job. Alderman Depo. 206:6-13. Defendant points to several other perceived inconsistencies between Plaintiffs' declarations and deposition testimony in arguing that

7

1 certification is improper.

2 To further rebut Plaintiffs' original declarations, Defendant submitted declarations from 20 Shift Supervisors who state that they perform a variety of exempt duties as Shift Supervisors (collectively known as "Defendant's declarations"). Alternatively, Defendant argues that if the Court were inclined to grant certification, that certification should be limited to the Las Vegas distribution center because Plaintiffs have failed to allege any sufficient evidence that Shift Supervisors outside the Las Vegas area are similarly situated.

## DISCUSSION

### A.  FLSA

Congress' principal purpose in enacting the FLSA was to protect all covered workers from substandard wages and oppressive working hours. *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). The FLSA was created to provide a uniform national policy of guaranteeing compensation for all work or employment covered by the Act. *Id.* at 741. The FLSA grants individual employees broad access to the courts and permits an action to recover minimum wages, overtime compensation, liquidated damages, or injunctive relief. *Id.* at 740. Under the FLSA, an employee may initiate a class action on behalf of himself or herself and other similarly situated people. 29 U.S.C. § 216(b). Court-supervised notice of pendency of § 216(b) actions "serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Hoffman–La Roche, Inc. v. Sperling*, 493 U.S. 165, 172 (1989). The clear weight of authority holds that the requirements for class action certification under Fed.R.Civ.P. 23(a) do not apply to claims arising under the FLSA. *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 761 (9th Cir.2010) (citing *Kinney Shoe Corp. v. Vorhes*, 564 F.2d 859, 862 (9th Cir.1977), overruled on other grounds by *Hoffman–La Roche, Inc. v. Sperling*, 493 U.S. at 167, n. 1).

Under § 216(b) actions, although a plaintiff may bring an action on behalf of himself and others similarly situated, "no employee shall be a party to any such action unless he gives his consent in writing to become such a party and such consent is filed with the court in which such action is brought." 29 U.S.C. § 216(b). This is commonly referred to as the "opt-in" provision.

1   District courts have the discretion to implement § 216(b) by facilitating notice to potential
2   plaintiffs. *Id.* at 169.  Although certification under the FLSA is not required, "certification in a §
3   216(b) collective action is an effective case management tool, allowing the court to control the
4   notice procedure, the definition of the class, the cut-off date for opting-in, and the orderly joinder of
5   the parties." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 989 (C.D.Cal. 2006).

6         Although the FLSA does not define the term "collective action," the Ninth Circuit has held
7   that a collective action is "an action brought by an employee or employees for and on behalf of
8   himself or themselves and other employees similarly situated." *Gray v. Swanney–McDonald, Inc.*,
9   436 F.2d 652, 655 (9th Cir. 1971) (quoting H.R.Rep. No. 326, 80th Cong., 1st Sess. at 14 )
10  (internal quotations omitted).  If the court finds the named plaintiffs have established that they are
11  "similarly situated," the court may, in its discretion, authorize the named § 216(b) plaintiffs to send
12  notice to all of the potential plaintiffs and may set a deadline for those plaintiffs to "opt-in" to the
13  suit. *Edwards*, 467 F.Supp.2d at 989.

14  **B.    The Similarly Situated Requirement**

15        The court must preliminarily determine whether the potential plaintiffs are "similarly
16  situated" to create an opt-in class under § 216(b).  *See Grayson v. K–Mart Corp.*, 79 F.3d 1086,
17  1097 (11th Cir. 1996).  A named plaintiff seeking to create a § 216(b) opt-in class must sue on
18  behalf of himself or herself and other "similarly situated" employees.  Named plaintiffs seeking to
19  create a § 216(b) opt-in class need only show that their positions are similar, but not identical to,
20  the positions held by putative class members.  *Id.* (quoting *Sperling v. Hoffman–La Roche, Inc.*,
21  118 F .R.D. 392, 407 (D.N.J.1988)).  The similarly situated requirement of § 216(b) "is more
22  elastic and less stringent" than the joinder and severance requirements found in Rule 20 and Rule
23  42 respectively of the Federal Rules of Civil Procedure.  *Id.* at 1095.

24        The FLSA does not define the term "similarly situated," and the Ninth Circuit has not yet
25  formulated a test for courts to determine whether putative class members are "similarly situated."
26  A number of courts, including this one, have adopted a two-step approach for determining whether
27  potential plaintiffs are "similarly situated" for purposes of conditional class certification under §
28  216(b).  *See Fetrow-Fix v. Harrah's Entertainment, Inc.*, 2011 WL 6938594 (D. Nev. 2011) and

*Hinojos v. Home Depot*, 2006 WL 3712944 (D. Nev. 2006). The two-step approach involves notification to potential class members of the representative action followed by a final "similarly situated" determination after discovery is completed. At the first, or "notice stage," the court relies "primarily on the pleadings and any affidavits submitted by the parties" [to decide] "whether the potential class should be given notice of the action." *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004). A fairly lenient standard usually applies at the initial stage of a collective action case because the court has "minimal evidence" to make its determination. *Mooney v. Aramco Services, Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995), overruled on other grounds by *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90–91 (2003); *Kane v. Gage*, 138 F.Supp.2d 212, 214 (D. Mass. 2001). At the initial notice stage, a plaintiff need only make substantial allegations that the putative class members were subject to a single decision, policy or plan that violated the law. *Mooney*, *Id*. at 1214 n. 8. The majority of courts have adopted this two-step approach. *Leuthold*, 224 F.R.D. at 466.

If the court conditionally certifies a class under § 216(b) and authorizes notice to putative class members, the parties conduct discovery, and once discovery is completed, the party opposing class certification may move to decertify the class. *Id.* at 467. In determining whether to certify or decertify the conditionally certified class, the court makes "a factual determination regarding the propriety and scope of the class." *Id.* Factors the court considers in making its factual determination include "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Id.* This determination is made after discovery is completed, so that the court has a complete factual record on which to base its decision whether the plaintiffs are similarly situated. If the plaintiffs are not similarly situated, "then the court may decertify the class and dismiss the opt-in plaintiffs without prejudice." *Id.*

**I.  Applicable Standard**

Both parties agree that the two-step approach should be used by this Court in determining whether to grant Plaintiffs conditional certification. The parties however dispute what step and what standard the Court should apply at this time. Plaintiffs argue the Court should base its

10

analysis under the lenient standard of the first step, or the "notice stage," because although some discovery has taken place, there is still considerable discovery that needs to take place before the Court can properly apply the second step analysis. Defendant however argues the Court should skip the first step and base its analysis under the standards of the second step, or "final stage," because considerable discovery has occurred and an ample factual record has been established.

When conditional certification is sought early in the action before discovery has taken place, the determination is made using a fairly lenient standard based "only on the pleadings and any affidavits which have been submitted." *Mooney*, 54 F.3d at 1213-14. However, where the parties have had an opportunity to conduct pre-certification discovery, courts tend to hold plaintiffs to a higher standard of proof. *See, e.g.*, *Olivo v. GMAC Mortg. Corp.*, 374 F.Supp.2d 545, 548 (E.D. Mich. 2004) (requiring "modest" factual support for class allegations where discovery had been allowed on the issue of collective action certification); *Thiessen v. Gen. Elec. Capital Corp.*, 996 F.Supp. 1071, 1081 (D. Kan. 1998) (adopting an "intermediate" approach in analyzing the "similarly situated" issue where the parties had engaged in three months of discovery); *Ray v. Motel 6 Operating, L.P.*, 1996 WL 938231 at 4 (D. Minn. 1996) (declining to apply lenient standard at the notice stage because the facts before the Court are extensive); *see also Hinojos v. Home Depot*, 2006 WL 3712944 (D. Nev. 2006) (applying second step analysis, noting that it was clear that the named plaintiffs were not similarly situated, and that the action would not be manageable).

In *Bouaphakeo v. Tyson Foods, Inc.*, 564 F.Supp.2d 870, 893 (N.D. Iowa 2008), the court further examined the two-step process and noted that

> the level of proof required at each stage in the FLSA collective action certification process is largely dependent upon the amount of information before the court. At the first step, when less information is before the court, plaintiffs simply need to come forward with a "factual basis," *Dietrich*, 230 F.R.D. at 577, a "colorable basis," Smith, 404 F.Supp.2d at 1149, or "substantial allegations," that the existing plaintiffs and putative plaintiffs "were together the victims of a single decision, policy or plan," *Davis*, 408 F.Supp.2d at 815. At the second step, the court has much more information and is in a position to "make a factual determination on the similarly situated question," *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir.1995), and therefore "plaintiffs must clear a higher hurdle to continue," *Frank*, 2007 WL 2780504, at *3.

. . .

11

Although the court in *Tyson* found it proper to proceed with the first step analysis, the court stated that "it cannot overlook the almost six months of substantial class discovery that the parties have conducted and the valuable information before the court that is relevant to the certification of Plaintiffs' collective action under the FLSA." *Id.* at 895.  The *Tyson* court therefore adopted what courts have labeled an "intermediate approach."  Essentially, where the parties have conducted discovery, courts will consider all the evidence before it and apply a heightened standard in making a determination of conditional certification.  *See Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F.Supp.2d 411, 415 (D.Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification."); *Jimenez v. Lakeside Pin-nPac, LLC*, 2007 WL 4454295, at *3 (W.D. Mich, 2007) (stating, because the parties had engaged in six months of pre-certification discovery, that "the Court will review Plaintiffs' allegations and affidavits in conjunction with the evidence gleaned through discovery").

Here, the parties have had four months to engage in pre-certification discovery.  *See* Scheduling Order (#32).   Over those four months, all seven named and opt-in Plaintiffs have been deposed; four Rule 30(b)(6) depositions of Defendant's corporate representatives have been conducted; several discovery requests have been served and responded to, resulting in the production of nearly 5,000 pages of documents; and sworn declarations from 20 other Shift Supervisors at the Las Vegas distribution centers have been collected.  Accordingly, in determining whether Plaintiffs have met their burden of showing that they are "similarly situated" to the putative class members, the Court will review Plaintiffs' allegations and affidavits in conjunction with the evidence obtained through discovery and apply a heightened standard.  Although it is not the role of the Court at this stage of the proceedings to decide the case on the merits, *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 368 (E.D. Tenn. 2006), the Court has "a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D.Minn. 1991).

. . .

Application of the intermediate standard is consistent with this district's prior decisions in *Fetrow-Fix v. Harrah* and *Hinijos v. Home Depot*. In *Fetrow-Fix*, plaintiffs sought class certification based on allegations that the defendants failed to pay non-exempt hourly employees straight time and overtime compensation for mandatory attendance at pre-shift meetings. 2011 WL 6938594, *1. The parties conducted extensive discovery prior to bringing the issue of conditional certification before the court. *Id.* In response to plaintiffs' arguments that the Court should not evaluate factual disputes, credibility or merits of the claims at the first stage, the court noted,

> Given the extent of the discovery that has been conducted by the Plaintiffs, the court will not consider the evidence in the record supporting the Plaintiffs' claims they are similarly situated to the putative class, while ignoring the discovery suggesting they are not. Having reviewed the voluminous moving and responsive papers and attached deposition transcripts, declarations and other exhibits, the court is simply not persuaded that the Plaintiffs have established that putative class members were subjected to a common decision, policy or plan that violated the FLSA. For these reasons the court concludes that it would not serve the interests of judicial economy to attempt to resolve the potential claims of a putative class consisting of 85,000 employees in 35 separate properties nationwide in this action. The court will therefore deny the motion to conditionally certify a collective action.

*Id.* at *8.

In *Hinojos v. Home Depot*, plaintiffs alleged unpaid overtime under the FLSA. 2006 WL 3712944. After extensive discovery took place, the Court stated that "there is a sufficient evidentiary record to determine whether this action can be managed on a collective basis." *Id.* at *2. The Court applied a heightened standard and found that it was clear that the plaintiffs were not similarly situated and the proposed class would not be manageable. *Id.*

In applying the heightened standard here, the Court concludes that the evidence provided by Plaintiffs is insufficient to warrant conditional certification of the putative class. Plaintiffs through their declarations and Complaint allege that the Engineered Standards deprive them of exercising managerial discretion such that their classification as exempt employees under the FLSA is improper. Even assuming that the Engineered Standards are "common" to all Shift Supervisors in each department, Plaintiffs by their own testimony have failed to make an adequate showing that the Engineered Standards are a common policy that deprives this potential class of Shift Supervisors of their discretionary authority.

The evidence before the Court does not demonstrate that the Engineered Standards strip Plaintiffs of their managerial responsibilities such that it binds the putative class together. In particular, the Court is concerned about the contradictions between Plaintiffs' declarations and their deposition testimony. Each of Plaintiffs' deposition testimony appears to contradict the relevant portions of their declarations and the allegations in the Complaint (#1). Further, Plaintiffs Alderman and Bieber admitted during their depositions that several portions of their declaration were incorrect, and Plaintiff Alderman agreed to the extent that her deposition differs from her declaration, her deposition testimony was correct. Alderman Depo. 215:8-16.

Each named and opt-in Plaintiff further indicated during their deposition that their primary duties as Shift Supervisors include among other things directing and evaluating their associates and managing the flow of goods in their department. During the depositions, the named and opt-in Plaintiffs further admitted that the D/C Supervisor Job Description generally reflected their duties and responsibilities as Shift Supervisors. *See* Master Exhibit 8 and Beauford Depo. at 116:9-16; Luksza Depo. at 122:13-16; Foser Depo. at 218:6-219:3; Bieber Depo. 91:16 - 92:20; Weilandt Depo. at 178:23-179:1; Alderman Depo. at 79:11-80:4; and. Howell Depo. at 125:23-126:7. The types of duties and responsibilities set forth in this Job Description along with the types of tasks Plaintiffs testified they perform, appear to be consistent with the regulation governing exemption from the overtime requirement of the FLSA. *See generally* 29 C.F.R. § 541.100(a)(2).[3]

To further support that Engineered Standards are not a common policy that strip Plaintiffs of their managerial/exempt duties, Defendant has offered sworn declarations from 20 other Shift Supervisors from the Las Vegas distribution centers indicating that they exercise personal judgment and regularly perform managerial duties. *See* Defendant's Response, Exhibits 14-33. Plaintiffs classify Defendant's declarations as "happy camper" declarations and argue that Plaintiffs have not had an opportunity to depose those individuals. Because the declarations of Shift Supervisors submitted by Defendant are consistent with and support the named and opt-in Plaintiffs' deposition

---

[3] In order to fall under the executive, administrative, or combination exemptions to FLSA's overtime protections, an employee's primary duty must be managerial or administrative, or a combination of the two. *See generally* 29 C.F.R. § 541.

testimony, the Court finds they are probative on the issue of the actual duties of Shift Supervisors.

It appears Plaintiffs would have the Court ignore the apparent contradiction between Plaintiffs' depositions and declarations. Plaintiffs did not address the alleged contradictions in its Reply, but to state in a footnote that at the "first stage analysis, however the court does not 'weigh the evidence.'" Reply (#58) at 3. Although under the traditional first stage analysis Plaintiffs are correct, this Court will not consider the evidence in the record supporting the Plaintiffs' claims they are victims of a common policy or plan that violates the FLSA, while ignoring the discovery suggesting they are not. *See Fetrow-Fix*, 2011 WL 6938594 at *8. The Court finds that Plaintiffs have failed to show that the Engineered Standards are a common policy that deprives Shift Supervisors of exercising their discretion and binds the Plaintiffs and the proposed putative class members together. Therefore, certification of Plaintiffs' proposed class is not warranted.

## CONCLUSION

Having reviewed the voluminous moving and responding papers and attached deposition transcripts, declarations and other exhibits, the Court is simply not persuaded that Plaintiffs have established that the putative class members were subjected to a common decision, policy or plan that violated the FLSA. The Court therefore concludes that it would not serve the interests of judicial economy to conditionally certify this collective action. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Conditional Certification (#8) is **denied**.

DATED this 8th day of August, 2012.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge